IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| LIONEL JAMES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 03-0031-CV-W-HFS |
| | ) | |
| KANSAS CITY CHIEFS FOOTBALL | ) | |
| CLUB, INC. LONG TERM DISABILITY | ) | |
| INSURANCE PLAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

On January 13, 2003, plaintiff Lionel James filed suit against defendant Kansas City Chiefs

Football Club, Inc. Long Term Disability Insurance Plan, an employee benefit plan, alleging that

the Plan administrator wrongfully terminated his long-term disability benefits. On August 12, 2003,

the court permitted Fortis Benefits Insurance Company, the Plan's insurer, to intervene in the case.

As a result, Fortis became a defendant. Plaintiff and defendants have filed cross motions for

summary judgment. Defendants' summary judgment motion also includes a motion in limine to

exclude certain evidence not contained in the administrative record. For the reasons set forth below,

plaintiff's motion for summary judgment will be denied. Defendants' motion for summary judgment

will be granted; one in limine request will be denied as moot and the other will be granted.

I.      **Summary Judgment Standards**

Summary judgment is appropriate where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(c); <u>Poller v. Columbia Broad. Sys., Inc.</u>, 368 U.S. 464, 467 (1962). A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party, and it must give that party the benefit of all reasonable inferences to be drawn from the evidence. <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Luigino's, Inc. v. Stouffer Corp.</u>, 170 F.3d 827, 830 (8th Cir. 1999).

## II.    Background[1]

Plaintiff Lionel James brings this action against defendants Kansas City Chiefs Football Club, Inc. Long Term Disability Insurance Plan (the Plan) and Fortis Benefits Insurance Company (Fortis), seeking reinstatement of long-term disability benefits that were terminated on April 12, 2001.[2]  Plaintiff began working for the Kansas City Chiefs football team in May 1998 and was employed as an assistant coach.  As of January 1, 1999, he was coaching running backs and earning $7,916.67 per month.  The Chiefs provide all of their employees with a plan of long-term disability benefits through the Plan.  The Plan's long-term disability benefits were insured by Fortis, which is also the Plan's claim administrator.  Fortis issued the policy in question in late 1997, and it was still in effect as of January 1, 1999.

---

[1]This section is intended to provide a factual backdrop for the analysis.  It is not intended to be an exhaustive review of the facts.

[2]Although Fortis refers to the discontinuation of plaintiff's benefits as a retroactive "denial," the word "termination" may be more appropriate, considering that plaintiff had been receiving benefits since April 1999.

2

Plaintiff's complaint alleges that his long-term disability benefits under the Plan were wrongfully terminated. It is undisputed that the Plan is an "employee welfare benefit plan" as defined in the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, et seq. Therefore, the Plan and the policy insuring it are regulated by ERISA, which controls the resolution of plaintiff's claim in this lawsuit.[3] Under the Plan, Fortis has "the sole discretionary authority to determine eligibility for participation or benefits and to interpret the terms of the Policy. All determinations and interpretations made by [Fortis] are conclusive and binding on all parties." AR 1289. The Plan defines "disability" as follows:

> *Disability or disabled* means that in a particular month, you satisfy either the Occupation Test or the Earnings Test, as described below. You may satisfy both the Occupation Test and Earnings Test, but you need only satisfy one Test to be considered *disabled*.
>
> Occupation Test
>
> > during a *period of disability*[4] (including the *qualifying period*), an *injury*, sickness, or pregnancy requires that you be under the *regular care and attendance* of a *doctor*, and prevents you from performing at least one of the *material duties* of your regular occupation.
>
> Earnings Test
>
> > You may be considered *disabled* in any month in which you are actually working, if an injury, sickness, or pregnancy, whether past or present, prevents you from earning more than 80% of your *monthly pay* in that month in any occupation for which your education, training or experience qualifies you. On each anniversary date of the date your *disability* started, we will

---

[3] Plaintiff's claim against the Plan is governed by 29 U.S.C. § 1132(a)(1)(B), which provides in part that a participant in an ERISA employee welfare benefit plan may bring a civil action "to recover benefits due to him under the terms of the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

[4] The Plan utilizes italics to designate words that are defined within it.

3

increase by 7.5% the *monthly pay* figure we use to decide whether you are *disabled* under this test. This increase will not affect the amount of benefit we pay.

AR 1271. The Plan defines "material duties" as "the set of tasks or skills required generally by employers from those engaged in a particular occupation. One *material duty* of your regular occupation is the ability to work for an employer on a *full-time* basis as defined in the *policy*." AR 1273. "Full-time" is defined as "working at least 30 hours per week, unless indicated otherwise in the *policy*." AR 1270. The Plan does not define the phrase "regular occupation." With regard to claims, the Plan provides that a claimant "must furnish whatever items we decide are necessary as proof of loss or to decide our liability. . . . If you do not furnish any required information or authorize its release, we will not pay benefits." AR 1289.

On January 11, 1999, plaintiff went to the emergency room complaining of abdominal pain and nausea. Plaintiff told hospital staff that his symptoms began on January 10, 1999, "the day following a fairly heavy alcohol binge" consisting of more than 5 drinks. AR 728. He was admitted to Menorah Medical Center through the ER on January 12, 1999. Plaintiff suffered from acute necrotizing pancreatitis and associated organ failure. On January 13, 1999, attending physician Michael Monaco, M.D., diagnosed plaintiff with "[a]cute pancreatitis[5] associated with abdominal pain, nausea and vomiting." AR 728-729. Plaintiff was ultimately discharged from the hospital on February 23, 1999. As part of his rehabilitation, he participated in physical, occupational and speech therapy. Plaintiff asserts that he continued recuperating through the balance of 1999 and into 2000.

---

[5]In a subsequent review of plaintiff's medical records, a Fortis in-house medical director Carolyn L. Jackson, M.D., stated: "Pancreatitis is an acute inflammation of the pancreas and, 80% of the time, it is due to alcohol consumption. Other causes are drugs, infection, obstruction of the pancreatic duct by gallstones, trauma, etc." AR 529.

4

Under the Plan, there is a 90-day qualifying period before long-term disability benefits may be awarded. AR 711, 1274. Plaintiff's claim for disability benefits under the Plan was signed on March 3, 1999 and received by Fortis on March 11, 1999. AR 741. On his "Claimant Statement," plaintiff indicated that he was first unable to work on January 11, 1999 due to "abdominal pain, nausea, difficulty breathing." Id. On the "Employer Claim Statement – Part 2 Physical/Non Physical Aspects of Job," LeAnne Shireman, personnel and benefits manager for the Chiefs, identified plaintiff's occupation as "Assistant Coach/Professional Football Club." AR 745. On that same form, Shireman listed the physical requirements of plaintiff's assistant coach position to include sitting 7 to 9 hours a day, standing and/or walking 5 hours a day, and occasionally lifting up to 50 pounds. AR 745. Other requirements of the position included frequently bending/stooping, and occasionally reaching above shoulder level, kneeling, balancing, pushing/pulling and squatting. Id.

Another document submitted with the claim paperwork was the "Attending Physician's Initial Statement of Disability," completed by Dr. Monaco on March 1, 1999. AR 743-744. In it, Dr. Monaco indicated that he had first seen plaintiff on January 11, 1999, and that plaintiff was hospitalized beginning on January 13, 1999 due to acute necrotizing pancreatitis. AR 743. He also indicated that plaintiff was unable to work because of "[m]ental difficulties and extreme weakness," was currently in physical, occupational and speech therapy, and had not yet reached maximum medical improvement. AR 744.

Fortis in-house nurse Colleen Cole, R.N., conducted a clinical services review of plaintiff's claim and concluded that "[c]urrent limitations from own occupation are supported." AR 713. In a March 23, 1999 letter, Fortis advised plaintiff that it had approved his claim for long-term

disability benefits, effective April 11, 1999, after the expiration of the 90-day qualifying period. Fortis stated that it would continue to request and review information on a periodic basis to certify plaintiff's continued disability status. The letter also stated: "We also ask that we receive immediate notification from you if you are released to return to work, in any capacity, or your condition greatly changes in any way. We should always be notified immediately if you receive any new source of income or if there are any changes in your income from any source." AR 711-712.

Plaintiff submitted a Supplementary Report for Benefits dated May 30, 1999, indicating that he had not returned to work since becoming disabled, but that he expected to return to work. AR 706-707. It was accompanied by a physician statement from Dr. Monaco, indicating that plaintiff's prognosis was "good," that he would likely have a reduction of his disabling symptoms by September 1999, and that he had not yet reached maximum medical improvement. AR 707. Plaintiff submitted another Supplementary Report dated February 9, 2000, again indicating that he had not returned to work since becoming disabled, but that he expected to return to work. AR 695-696. An accompanying statement from treating physician Clifton A. Latting, M.D., stated that he had only seen plaintiff once and had no medical records for Fortis to review. He indicated that plaintiff was physically able to exert occasional force up to 50 pounds and/or frequent force up to 25 pounds; he did not offer any other opinion about plaintiff's work capabilities or prognosis. AR 696. Fortis felt that it lacked sufficient information to determine the severity of plaintiff's condition, so it requested all medical records from plaintiff's treating physicians in Kansas City and Birmingham, Alabama[6] and had them reviewed and evaluated by Fortis in-house medical director Carolyn L. Jackson, M.D. In a July 10, 2000 evaluation report, Dr. Jackson stated that "more

---

[6]Plaintiff apparently moved to Birmingham in late 1999.

6

information is needed before a definitive conclusion can be given in regards to degree of impairment," and recommended obtaining updated medical records, laboratory and diagnostic studies, as well as current restrictions and limitations from plaintiff's treating physicians.  AR 528-530.

On August 9, 2000, Fortis requested updated medical records and a Physical Capabilities Evaluation (PCE) from Dr. Jack L. Maudlin and Dr. Latting.  On October 6, 2000, Fortis received an incomplete PCE from Dr. Maudlin.  The PCE was blank except for comments in the "Remarks" section that he had no additional lab reports, that plaintiff had not returned to see him, and that a disability determination should be made by Dr. Latting.  AR 502-503.

In a Supplementary Report dated November 27, 2000, plaintiff again indicated that he had not returned to work since becoming disabled, but that he expected to return to work.  AR 472-473. The physician statement page was left blank; however, some gastroenterology records from treating physician Gregory L. Champion, M.D., accompanied the Report.  In a January 15, 2001 letter, Fortis requested additional information from Dr. Champion regarding plaintiff's condition.   In his response, Dr. Champion did not answer Fortis' questions, instead indicating that the Fortis should direct the questions to plaintiff's surgeon, William N. Viar, M.D. (who removed his gallbladder in December 2000).  AR 456-459.

Subsequently, Fortis requested that plaintiff undergo an independent Functional Capacity Evaluation (FCE), scheduled for March 16, 2001.  Plaintiff went to the FCE, but it was cancelled because he was using a crutch (for a hip problem unrelated to his disability claim).  AR 441-443. Later that day, a therapist at the FCE facility contacted a Fortis affiliate (Network Medical Review Company) and stated that she recognized plaintiff as a coach for the XFL Birmingham Thunderbolts

7

and had seen him the night before at a game, not using a crutch. AR 441-442. Plaintiff denied to the therapist that he was working for pay and said he was an intern; the therapist (whose husband worked for the team) indicated that interns were paid. Id.

As of March 16, 2001, the BirminghamBolts.com website listed plaintiff as "Running Backs Coach" and "Co-Def. Coordinator/Def. Backs" for the Birmingham Thunderbolts. AR 438-440. Fortis conducted surveillance of plaintiff on March 30 and 31, 2001 at his home and at a Birmingham Thunderbolts football game. AR 432-433. In the March 31, 2001 videotape, plaintiff is dressed in a purple team warmup suit and a ball cap and is talking to and coaching players, sometimes drawing up plays on a dry erase board, reading some written materials and taking notes, talking to other team staff members, and using a headset and wearing a belt to hold the accompanying equipment. In terms of physical movement, plaintiff is seen standing, walking up and down the sidelines, kneeling, bending over with his hands on his knees and crouching, and sitting only briefly. The 2 videotapes span a few hours; the game lasts roughly 3 hours. Defs.' Ex. A2.

On April 5, 2001, Fortis discussed plaintiff's employment with Edwina Britton in the Birmingham Thunderbolts' personnel office. According to a Fortis document, Britton advised that plaintiff was a full-time employee during the football season of December 1, 2000 through May 2001, but that he was considered seasonal because he was only hired for the playing season. AR 431. As an Intern Coach, plaintiff received a base salary of $5,000 for that season, plus a bonus for each win. Id. Plaintiff maintains that he was a part-time employee and cites a letter from

8

Thunderbolts head coach Dave Arslanian.[7]  The letter states that plaintiff's position with the team

was listed as "Offensive Assistant" and "was not a full-time position."  AR 246.  Further, "[h]e was

with us part time for 1 week in November 2000, 1 week in December 2000, and from January 2001

to April 2001."  Id.

According to an April 9, 2001 Fortis document, Fortis learned that plaintiff had also worked

as a football coach for the Birmingham Steeldogs, an Arena Football 2 (AF2) team, from January

2000 though August 2000, earning $500 a week.  AR 417.  Plaintiff notes that the document states

that he started "on or about" January 2000; he states that in fact he did not start working for the

Steeldogs until March 2000 and cites to his Steeldogs 2000 W-2, which reflects $12,492.87 in

earnings.[8]  Fortis correctly states that plaintiff did not report his Steeldogs employment on his

February 9, 2000 Supplementary Report, but plaintiff maintains the report was accurate because he

did not work for the team at that time.[9]

On April 11, 2001, Fortis return-to-work specialist Angela Rush reviewed plaintiff's file and

recommended a denial of plaintiff's disability benefits claim retroactive to when Fortis maintains

that he returned to coaching professionally, January 2000.  AR 412-413.  Rush stated that based on

plaintiff's file, she did not think he would have satisfied either the Occupation Test or the Earnings

_____

[7]The letter was dated August 10, 2001, roughly 4 months after Fortis terminated
plaintiff's benefits on April 12, 2001.

[8]He argues that if he had started in January, he would have earned roughly $4,000 more
based on the $500/week salary.

[9]Significantly, even if plaintiff is correct, he still failed to fulfil his ongoing obligation to
immediately report any new sources of income (an express requirement for continued benefits)
by never reporting his Steeldogs income or his Thunderbolts income to Fortis.  But for the
therapist recognizing him at the FCE, Fortis might not have learned that plaintiff had returned to
coaching professional football while collecting full disability benefits.

9

Test for disability benefits under the Plan from January 2000 forward. By letter dated April 12, 2001, Fortis advised plaintiff that he failed to prove he continued to satisfy the Plan's definition of disability and that his disability benefits were denied retroactive to January 2000. AR 406-409. Fortis stated that it had reviewed medical records from plaintiff's physicians. "Based on the review of those records, when considered with the activity level that you have displayed, it was determined that you have recovered from your medical condition of acute necrotizing pancreatitis to the point that it is no longer precluding you from performing at least one of the material duties of your occupation." AR 407. Thus, based on plaintiff's return to professional coaching, Fortis determined that plaintiff did not meet the Occupation Test. Fortis also determined that plaintiff did not meet the Earnings Test, because "[a] review of your activities since January 1, 2000 does not document a medical condition that would prevent you from earning more than 80% of your *monthly pay*." Id. Lastly, Fortis concluded that plaintiff was not entitled to benefits after January 2000 and demanded repayment of $76,454.00, the amount of benefits that Fortis considered overpaid. Id.[10]

On May 3, 2001, Fortis received plaintiff's written appeal the April 12, 2001 benefits termination. The appeal letter was accompanied by various W-2s, tax returns, and paystubs, as well as some sample coaching schedules/responsibilities. Plaintiff asserted that he satisfied the Occupation Test because he could not work the long hours of an assistant coach, which he contends is a material duty of his occupation. He also asserted that he met the Earnings Test, because he did not earn 80 percent of his former Chiefs salary when coaching for either the Steeldogs or the

---

[10]Also on April 12, 2001, Fortis representative Rush discussed the benefits decision with plaintiff. A record of the call states that although plaintiff said that the coaching positions were part time or internships, Rush indicated that it did not matter because, in Fortis' view, he performed all material duties of a coach as defined by the occupation. AR 397. "He said had he known it would have cut him off he never would have done it." Id.

Thunderbolts.  Plaintiff acknowledged that he did not report either coaching position to Fortis, but he stated that it was a mistake and that he "was not trying to hide that part time situation."  AR 352-371.  Plaintiff's letter indicated that he would be sending recent medical records, which were ultimately received by Fortis on May 18, 2001.  AR 335-348.

Fortis requested an independent medical review by Robert C. Porter, M.D., who is board certified in occupational medicine.  In his June 14, 2001 report, Dr. Porter opined in part that plaintiff "is considered physically capable of functioning in at least a medium work level with accommodations during exacerbations of his chronic pancreatitis.  The accepted length of disability during the flareups would be 3 to 6 weeks for medium level work, depending on the severity of symptoms."  AR 320.  He opined that plaintiff's prognosis "is dependent on his compliance with the treatment plan especially concerning diet modifications and no alcohol consumption," and that "based on the most recent information, Mr. James' chronic pancreatitis symptoms are being adequately controlled with his current treatment plan."[11]  AR 321.  Dr. Porter completed an Estimation of Physical Capacities form, opining that plaintiff was not restricted in his ability to sit, stand or walk, and that he was capable of lifting, carrying or pushing up to 50 pounds.  AR 324-325.  On June 19, 2001, Fortis in-house medical director Craig Heligman, M.D., reviewed Dr. Porter's report, concluding that "Dr. Porter's opinions are supported based upon my review of the medical information and review of the videotape. . . .  The available information supports the conclusion that the claimant has been capable of working in his own occupation since at least January 2000."  AR 288.

---

[11]Dr. Porter also reviewed the surveillance video and stated that "[t]he tape supports Mr. James' ability to function in at least a medium work level.  It also supports that his chronic pancreatitis symptoms are under control with his current treatment plan."  AR 322.

In a June 29, 2001 letter, Fortis advised plaintiff that it was upholding its April 12, 2001 benefit denial.  AR 278-286.  The decision was based upon plaintiff's medical records, in-house and independent medical reviews, and information from the Investigative Services Unit (regarding plaintiff's employment as a coach for the Steeldogs and Thunderbolts).  As to the Occupation Test, Fortis reiterated the Plan's definition of "material duties" and stated it "does not include any duties, not generally required, but that an employer may require you to perform, difficulties with co-workers or management, or relocation to another part of the country."  AR 279.  As to the Earnings Test, Fortis stated: "[Y]our <u>condition</u> must prevent you from earning 80% of your monthly pay.  The information in file documents that you would be physically capable of performing you occupation with the KC Chiefs, thereby earning more than the amount required to meet the Earnings Test."  <u>Id.</u>  On July 25, 2001, Fortis received plaintiff's second appeal.  AR 259-263.  Then on August 27, 2001, Fortis received a letter of appeal from plaintiff's attorney, enclosing some financial documents and the August 10, 2001 letter from Dave Arslanian, detailed earlier in this section.  AR 247-255.  Plaintiff's attorney later submitted some additional medical records and an October 16, 2001 letter from Dr. Champion.[12]  At Fortis' request, Dr. Porter reviewed the additional medical records.  In a December 20, 2001 report, Dr. Porter stated that the new information did not change the opinions

---

[12]That letter stated in part: "It sounds like [plaintiff] has recurrent flares every two to four months, which require pain medication and/or admission to the hospital for pain control. Because of this situation, I think it would be very difficult, if not impossible, for him to have a job which required him to be there on a daily basis and work the prolonged hours that you mentioned in your note.  I suspect he will continue to have bouts of recurrent pain and pancreatitis in the future, which would be causing him to miss a significant amount of work." AR 33.  Notably, the letter was addressed to plaintiff's attorney and was created late in the appeals process.  Plaintiff has not cited contemporaneous medical records supporting the letter's conclusions.

expressed in his initial report, and that he estimated plaintiff "would have 1 or 2 episodes per year requiring work loss of 1-3 weeks." AR 22-23.

By letter dated February 15, 2002, Fortis advised plaintiff that the Appeals Committee wanted him to submit a copy of the complete hospital records and all the dates of hospital confinement. Once received, the records would be sent for an independent medical review by a gastroenterologist[13]; after the report was received, then the Appeals Committee would re-convene to review it.[14] AR 13. On June 12, 2002, gastroenterologist Manoj Mehta, M.D., completed his review of plaintiff's records[15] and he opined in part: "There is no reason or time frame during which Mr. James would not be able to work in his occupation. As with anybody, if he suffers from an acute illness, he may require hospitalization. He may have a relatively mild course of recurrent acute episodes or he could have a severe episode. This would be impossible to predict. Nonetheless, working or not working would not in any way aggravate or influence the situation."[16] AR 811-812. In an Estimation of Physical Capacities form, Dr. Mehta opined that plaintiff had no

---

[13]Fortis requested this information again in March and April 2002, but it is unclear whether plaintiff provided it or whether Fortis ultimately just submitted what it had to the Appeals Committee.

[14]Although not mentioned in the letter, the Appeals Committee asked Fortis to contact the Chiefs to verify the material duties of plaintiff's job as well as information related to their sick leave policy. AR 1251.

[15]Since the January 1999 hospitalization for acute necrotizing pancreatitis, Dr. Mehta opined that plaintiff had been hospitalized on 4 other occasions "with the probable diagnosis of acute pancreatitis" – August 2000, March 2001, August 2001 and January 2002. AR 809.

[16]Further, "[n]o specific tasks are found in Mr. James' job description, which he would be unable to perform. The only accommodations foreseeable would be a back-up person to fill his normal job duties if he becomes acutely ill." AR 812.

13

restrictions in sitting, standing or walking, and that plaintiff could lift, carry or push up to 100 pounds. AR 814-815.

In a June 27, 2002 letter to the Chiefs, Fortis noted that plaintiff was hospitalized for his condition 4 times: January 12, 1999 - February 23, 1999; August 21-26, 2000; March 20-23, 2001; and August 18-22, 2001. AR 796. Fortis stated that, according to a gastroenterologist, between periodic episodes plaintiff "would be fully functional without any limitations on his physical ability." Id. Fortis then asked: "Given a history of absences as described above, in your opinion, would Mr. James have been able to perform the material duties of his occupation." Id. Shireman of the Chiefs discussed the letter with Chiefs Assistant General Manager, Denny Thum, and on July 1, 2002, called Fortis and indicated that plaintiff would have been able to perform his occupation despite the documented occurrences of his condition. AR 795. In a July 8, 2002 letter, Fortis advised plaintiff that his appeal had been brought before the Appeals Committee and that Fortis was again reaffirming the benefit denial. In addition to detailing the reviewing physicians' conclusions and why plaintiff did not meet either test for disability, Fortis noted that plaintiff did not suffer any reduction in function between episodes and that Fortis did not insure against the possibility of future disability. AR 790-792. After this final benefit determination, plaintiff filed suit against the Plan.

## III. Analysis

### A. Standard of Review

As an initial matter, the court must determine the correct standard of review to apply when analyzing Fortis' final benefit determination that terminated plaintiff's long-term disability benefits. "Under ERISA, a plan beneficiary has the right to judicial review of a benefits determination." Sahulka v. Lucent Techs., Inc., 206 F.3d 763, 767 (8th Cir. 2000). When a plan gives the

14

administrator "discretionary authority to determine eligibility for benefits," the court reviews the administrator's decision for an abuse of discretion. Woo v. Deluxe Corp., 144 F.3d 1157, 1160 (8th Cir. 1998) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)).

The court may depart from the abuse of discretion standard if "the beneficiary comes forward with evidence establishing that the administrator acted under a conflict of interest, dishonestly, with an improper motive, or without using judgment." Sahulka, 206 F.3d at 768. To obtain a less deferential review, the plaintiff "must present material, probative evidence demonstrating that (1) a palpable conflict of interest or serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to [the plaintiff]." Woo, 144 F.3d at 1160-61. The second prong of this two-part test requires the plaintiff to "demonstrate that the conflict or irregularity has a connection to the substantive decision reached." Sahulka, 206 F.3d at 768. "The evidence must give rise to 'serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim.'" Id. (quoting Barnhart v. UNUM Life Ins. Co. of America, 179 F.3d 583, 589 (8th Cir. 1999)). If the court finds that the plaintiff has satisfied the two-part test, then it must utilize a "sliding scale" approach to determine how much less deference should be given to the administrator's decision. Woo, 144 F.3d at 1161. The court will "apply an abuse of discretion analysis, taking into consideration the conflict or procedural irregularity. The abuse of discretion standard is inherently flexible, which enables reviewing courts to simply adjust for the circumstances." Id.

Here, the abuse of discretion standard is the default because the Plan expressly gives the administrator the sole discretionary authority to determine eligibility for participation or benefits and

Case 4:03-cv-00031-HFS   Document 54   Filed 06/28/05   Page 15 of 28

to interpret the Plan's terms. Plaintiff contends that a less deferential review is warranted based on the purported presence a financial conflict of interest and five serious procedural irregularities.

### 1.     Conflict of interest

Plaintiff first asserts that Fortis has a financial conflict of interest because it is both the Plan administrator and the insurer; thus, it profited financially by terminating plaintiff's benefits. When the insurer and the Plan administrator are one in the same, it is "something akin to a rebuttable presumption of a palpable conflict of interest." Schatz v. Mutual of Omaha Ins. Co., 220 F.3d 922, 947-48 (8th Cir. 2000). However, not every funding conflict inevitably leads to the conclusion that a palpable conflict of interest exists. See, e.g., Davolt v. The Executive Comm. of O'Reilly Auto., 206 F.3d 806, 809 (8th Cir. 2000) (finding that the district court erred in assuming an automatic conflict of interest). As the Schatz court noted: "Indicia of bias can be negated by ameliorating circumstances, such as equally compelling long-term business concerns that militate against improperly denying benefits despite the dual role." Schatz, 220 F.3d at 948 (quotations omitted).

Even if the court were to assume, without deciding, that a palpable conflict of interest existed, plaintiff has not satisfied the second prong of the Woo test. Plaintiff argues that Fortis discontinued his benefits without a medical opinion to justify the change in position, and that no doctor reviewed plaintiff's case until after the April 2001 termination. That is inaccurate. In fact, Dr. Jackson reviewed plaintiff's file on July 10, 2000, long before the denial. On Dr. Jackson's recommendation, Fortis requested updated medical records and functionality assessments from plaintiff's treating physicians, but few records were received and many functionality forms were left incomplete. Then on March 16, 2001, plaintiff showed up with a crutch to his scheduled Functional Capacity Evaluation, causing its cancellation. It was then that Fortis learned that plaintiff had been

16

coaching for the Thunderbolts while receiving disability benefits. Based on the record, the court finds that there was no connection between Fortis' alleged financial conflict and the decision to deny benefits, nor has there been any breach of fiduciary duty.[17]

## 2. Occupation's DOT description and classification

As the first of several alleged serious procedural irregularities, plaintiff argues that Fortis understated the physical demands of plaintiff's occupation and did not have a copy of the Dictionary of Occupational Titles (DOT) job description in the file. Certain portions of the record do mention the DOT, including some of Fortis' forms. See, e.g., AR 707, 1250. In addition, Dr. Jackson noted that there was no DOT description in plaintiff's file. AR 529. The DOT classifies the physical demands of the occupation of "Coach, Professional Athletes" as "Heavy,"[18] but in a certain records, Fortis referred to plaintiff's occupation as "Light" or "Medium" duty. AR 463, 469, 1250.

---

[17]Moreover, as Fortis notes, there is no evidence that Fortis provided any incentives or bonuses to claims reviewers to encourage claims denials. Compare Armstrong v. Aetna Life Ins. Co., 128 F.3d 1263 (8th Cir. 1997).

[18]Defendants have moved in limine to exclude the affidavit of rehabilitation counselor James M. England, Jr. and the attached DOT excerpt (Plf.'s Ex. B) because this evidence was not previously submitted to Fortis during the claims review process and therefore was not in the administrative record. Absent unusual circumstances, a court should limit its review to the administrative record as it existed at the time of the final benefit determination. Cash v. Wal-Mart Group Health Plan, 107 F.3d 637, 641-42 (8th Cir. 1997). Plaintiff has provided no explanation for why he did not submit the DOT excerpt at any time during the lengthy claim review process. That said, the court is quite familiar with the DOT and will take judicial notice of its contents for the purposes of resolving the question of whether a serious procedural irregularity exists. Therefore, the motion in limine as to this evidence will be denied as moot.

The court finds that Fortis' failure to include the DOT description[19] and its misstatement of the DOT exertional level of plaintiff's occupation, even in combination, are of little consequence. Nothing in the Plan requires Fortis to consider the DOT classification in making a disability determination, and Fortis asserts that it did not rely on the DOT classification in rendering its final benefit determination.[20] Moreover, under the DOT definition, "Heavy Work" entails "[e]xerting 50 to 100 pounds of force occasionally, and/or 25 to 50 pounds of force frequently, and/or 10 to 20 pounds of force constantly to move objects." As Fortis notes, evidence in the record demonstrates that plaintiff met the "Heavy" exertional requirements. On February 11, 2000, treating physician Dr. Latting opined that plaintiff could exert occasional force of up to 50 pounds. On June 14, 2001, independent reviewing physician Dr. Porter opined that plaintiff could exert up to 50 pounds of force. And on June 12, 2002, independent reviewing physician Dr. Mehta opined that plaintiff could exert up to 100 pounds of force. Considering these facts, the errors related to the DOT description and exertion classification do not add up to a serious procedural irregularity.

### 3. Fortis' "communication of misinformation" to the Chiefs

On this point, plaintiff argues that Fortis failed to disclose certain information material to the Chiefs' determination as to whether plaintiff could do his job. On June 27, 2002, Fortis sent a letter

---

[19]Though plaintiff argues that this omission is significant, he points to nothing in the DOT description itself, instead focusing entirely on the "Heavy" classification as denoted with an "H" at the description's end. The description itself offers little in the way of physical requirements, so its omission is insignificant.

[20]Fortis acknowledges that the DOT description might have been relevant in determining, in the abstract, whether plaintiff was capable of performing the material duties of his regular occupation. That abstract determination was not necessary, Fortis argues, because plaintiff demonstrated the ability to perform the material duties of that occupation by actually returning to coaching professional football with both the Steeldogs and the Thunderbolts. This point is well taken.

18

to the Chiefs, listing 4 hospitalizations resulting from plaintiff's pancreatitis (January 12, 1999 - February 23, 1999; August 21-26, 2000; March 20-23, 2001; and August 18-22, 2001), and stating that according to a gastroenterologist, plaintiff would be fully functional between such periodic episodes.[21]  Based on the letter's contents, the Chiefs' Denny Thum ultimately determined that plaintiff could have performed the material duties of his occupation.  Plaintiff complains that the letter misinformed the Chiefs because it omitted several hospitalizations, failed to advise that plaintiff would have periodic acute attacks requiring absences from 1 to 6 weeks, and failed to include Dr. Mehta's opinion that a "back-up person" would be needed to do plaintiff's job if he became acutely ill.

As to hospitalizations, with the exception of January 28-29, 2002, Fortis included all hospitalizations for which Dr. Mehta opined the probable diagnosis was acute pancreatitis.  Fortis denies that several other hospitalizations were for pancreatitis.[22]  Based on the medical records, it is debatable whether certain hospitalizations were in fact for pancreatitis, so Fortis' failure to list them in the letter was not unsound.  In addition, although Fortis did not state that plaintiff's

---

[21]Plaintiff points out that during a March 25, 2002 conversation between Fortis representative Deb McGlaughlin and Chiefs personnel and benefits manager LeAnne Shireman, Shireman indicated that if plaintiff was expected to incur a 3-6 week absence during the season, she felt "that would not be workable," but to contact her after the gastroenterologist's review and she would verify it with Carl Peterson.  AR 2.  Plaintiff argues that based on Shireman's comments, Fortis "set about to manipulate the record so as to justify terminating plaintiff's benefits," by finding a gastroenterologist who would say that future absences were unpredictable rather than a set number of weeks.  This argument is unsupported.  First, the call record reflects that Shireman "doesn't track the football side" and that someone else would need to be consulted.  Thus, her opinion was not dispositive.  Second, Dr. Mehta was an independent consulting physician who reviewed plaintiff's medical records.  There is no evidence that Fortis somehow coerced him into issuing a report that was favorable to it.  Third, the letter included absences ranging from a few days to 6 weeks.

[22]For example, two hospitalizations were for gall bladder surgery and gastroenteritis.

19

condition could result in multiple-week absences for acute attacks, the duration of the hospitalizations themselves demonstrate as much. Lastly, it is not significant that Fortis did not include Dr. Mehta's opinion regarding the potential need for a "back-up person." This opinion is just a practical statement that someone would have to do plaintiff's job if he had an extended absence, something which could be readily deduced from the cited absences. In short, plaintiff's problems with Fortis' June 27, 2002 letter do not amount to a serious procedural irregularity.[23]

### 4. Failure to reconvene Appeals Committee

Plaintiff's next argument involves the final meeting of the Appeals Committee. On February 15, 2002, Fortis sent a letter to plaintiff stating that the Appeals Committee had met but would reconvene to consider plaintiff's appeal after it received a physician review report from a gastroenterologist (Dr. Mehta). AR 13. The July 8, 2002 final benefit determination letter stated that plaintiff's appeal had been brought before the Appeals Committee and that "[i]t was the determination of the Committee that Mr. James does not meet the definition of disability, as defined by the policy." AR 790. Plaintiff argues that because the administrative record does not contain a

---

[23]Plaintiff also seeks to introduce the testimony of Denny Thum, who was deposed on November 11, 2003. In part, Thum testified that if plaintiff was to be absent for 3 to 6 weeks during the season (from July through at least December), he would not be able to do all of the material duties of his job as an assistant running backs coach. Plf.'s Ex. C, Thum Depo. 16:23-17:5. Defendants have moved in limine to exclude this evidence because it is not part of the administrative record, which closed on July 8, 2002. Cash, 107 F.3d at 641-42. The court will exclude Thum's testimony. As an aside, the court notes that even if this evidence was considered, it would not change the court's conclusion that the letter was adequate. Thum's testimony rests upon the assumption (posed by plaintiff's attorney) that the absences would occur during the season. There are no documented 3- to 6-week absences during the Chiefs' season months, and there does not appear to be any medical basis for predicting that future absences would necessarily occur during the season. In seeking the Chiefs' opinion of plaintiff's employability, Fortis was not required to engage in conjecture about when an absence might occur and how long it might last.

document reflecting a second Appeals Committee meeting, that the Committee never reconvened. Fortis argues that the July 8 letter demonstrates that the Committee made the final benefit determination. The court agrees with Fortis, especially since plaintiff has not come forward with any evidence that any other person or entity made the final benefit determination.[24] Therefore, the absence of the meeting's documentation does not constitute a serious procedural irregularity.

### 5. Insufficient medical basis for initial termination of benefits

Plaintiff asserts that Fortis' April 12, 2001 termination of benefits was improper because there was no "medical evidence that plaintiff's condition had improved to the extent he was no longer disabled." Instead, plaintiff claims, without support, that the termination was based on an undocumented "triage" by in-house medical director Dr. Heligman. In fact, the initial termination decision appears to have been based on information gathered in Fortis' efforts to investigate whether plaintiff continued to be disabled. "[I]n determining whether an insurer has properly terminated benefits that it initially undertook to pay out, it is important to focus on the events that occurred between the conclusion that benefits were owing and the decision to terminate them." McOsker v. Paul Revere Life Ins. Co., 279 F.3d 586, 590 (8th Cir. 2002). Here, in-house medical director Dr. Jackson reviewed plaintiff's file on July 10, 2000, recommending that Fortis gather additional medical records and assessments. Few medical records were received, so Fortis scheduled a Functional Capacity Evaluation for March 16, 2001. After the FCE was cancelled because plaintiff showed up on a crutch, Fortis learned from the FCE therapist that plaintiff was coaching for the

---

[24]Plaintiff's argument proves too much and ignores other possibilities. The document memorializing it may have simply been lost in the effort to assemble the more than 1,200-page record. The Committee's second meeting may have been brief or informal or the Committee may have reconvened by phone, which might lessen the likelihood of documentation. In any event, the court will not jump to the conclusion that the meeting did not occur.

Case 4:03-cv-00031-HFS   Document 54   Filed 06/28/05   Page 21 of 28

Birmingham Thunderbolts.[25]  That information led to the discovery that plaintiff had also coached for the Birmingham Steeldogs in 2000.  Plaintiff's failure to submit medical evidence of his continuing disability, coupled with fact of plaintiff's employment in his regular occupation while he was receiving disability benefits, were significant events occurring between the benefits' conferral and termination, events that were sufficient to justify an initial termination.  Significant medical reviews followed during the appeals process, validating the initial termination.[26]  There is no serious procedural irregularity.

### 6.    Failure to exercise objective judgment

Lastly, plaintiff claims that Fortis' decision to terminate benefits was "reached without reflection or judgment."  Plaintiff begins by reiterating the "Heavy" work argument, which was analyzed and rejected earlier in this opinion.  No further analysis is necessary.  Plaintiff then argues that Dr. Mehta's June 12, 2002 report does not support Fortis' decision to terminate plaintiff's benefits, finding fault with the report itself as well as Fortis' use of the report.  For example, plaintiff asserts that Dr. Mehta failed to attribute certain hospitalizations to pancreatitis, wrongly concluded that plaintiff was fully functional between episodes, and did not have enough information to assess plaintiff's ability to work between episodes because he read the surveillance summary but did not

---

[25]In various Supplementary Reports, plaintiff denied working.  Fortis' surveillance of plaintiff coaching at a Thunderbolts game revealed that plaintiff had apparently returned to his regular occupation of coaching, which was significant and substantial evidence supporting the termination of his benefits.  Compare Morgan v. UNUM Life Ins. Co. of America, 346 F.3d 1173, 1177-78 (8th Cir. 2003) (surveillance revealed nothing new and was not substantial evidence supporting decision to discontinue disability benefits).

[26]Plaintiff's attempt to liken this case to Woo unfounded.  In Woo, the court found a serious procedural irregularity based on the insurer's failure to seek an independent medical review by a specialist at any time during the claims review process.  See Woo, 144 F.3d at 1161.  Here, by contrast, Fortis did obtain an independent medical review by a gastroenterologist.

Case 4:03-cv-00031-HFS   Document 54   Filed 06/28/05   Page 22 of 28

view the tape. The first two items represent plaintiff's disagreement as to what the medical evidence shows; they are not flaws in the report. With regard to the surveillance tape, the summary (while not as vivid) adequately conveyed the tape's contents by documenting plaintiff's coaching during a Thunderbolts game. Plaintiff also asserts that Fortis sought a gastroenterology review only after the Chiefs' Shireman indicated that if plaintiff were absent 3 to 6 weeks during the season, that "would not be workable." In fact, it was the Appeals Committee that requested the additional review, more than a month <u>before</u> the conversation with Shireman. The court concludes that Fortis' reliance upon Dr. Mehta's report does not demonstrate that its decision to terminate benefits was reached without reflection and judgment. Thus, the court finds no serious procedural irregularity.

### B. Fortis' Decision to Terminate Benefits

Because plaintiff has failed to satisfy the two-part <u>Woo</u> test for obtaining a less deferential review,[27] the court will analyze Fortis' final benefit determination for abuse of discretion. Under the abuse of discretion standard, a plan administrator's decision denying benefits "will stand if a reasonable person could have reached a similar decision." <u>Woo</u>, 144 F.3d at 1162 (citing <u>Donaho v. FMC Corp.</u>, 74 F.3d 894, 897 (8th Cir. 1996)). The standard does not require that "a reasonable person <u>would</u> have reached that decision." <u>Cash</u>, 107 F.3d at 641. In evaluating whether the benefits denial was reasonable, the court must determine "whether the decision was supported by substantial evidence, which is more than a scintilla but less than a preponderance." <u>Woo</u>, 144 F.3d at 1162.

---

[27]The court notes that even if it had found any of the five alleged procedural irregularities to be serious, plaintiff has not come forth with evidence demonstrating either a connection between any irregularity and the decision or a breach of fiduciary duty sufficient to satisfy the second prong of the <u>Woo</u> test.

In a claim for benefits under ERISA, the plaintiff bears the burden of proof. Farley v. Benefit Trust Life Ins. Co., 979 F.2d 653, 658 (8th Cir. 1992) ("it was [the claimant's] burden to show that he was entitled to the 'benefits . . . under the terms of his plan.'"); Lickteig v. Business Men's Assurance Co. of America, No. 93-0888-CV-W-6, 1994 WL 463944, at *3 (W.D. Mo. 1994) ("in [the Eighth Circuit] the plaintiff has the burden of proving his eligibility for benefits in any employee benefit plan.") (citing Farley). Here, plaintiff bears the burden of proving that he is "disabled" as defined by the Plan. Although plaintiff initially demonstrated that he was disabled, he was required to provide proof of his continued disability status. Fortis asserts that he failed to do so.

Under the Plan, a participant is "disabled" if he satisfies either the Occupation Test or the Earnings Test. To satisfy the Occupation Test, plaintiff had the burden of proving that a sickness prevented him from performing at least one of the material duties of his "regular occupation."[28] The court finds that substantial evidence supported Fortis' termination of plaintiff's disability benefits, based on plaintiff's failure to prove that he continued to satisfy the Occupation Test. First, plaintiff returned to work as a professional football coach for the Birmingham Steeldogs and the Birmingham Thunderbolts,[29] as documented by surveillance videotape of plaintiff coaching a Thunderbolts game

---

[28]The court agrees with Fortis that a claimant's regular occupation is not the same as his particular job. See, e.g., Jones v. Continental Cas. Co., 35 F. Supp. 2d 1304 (D. Kan. 1999). Here, plaintiff's regular occupation is professional football coach, not his specific job as a running backs coach for the Chiefs. Plaintiff's coaching jobs with the Steeldogs and the Thunderbolts also fall within his regular occupation.

[29]Despite his obligation to disclose a return to work and new income to Fortis, plaintiff concealed these jobs from Fortis and worked for the teams and earned money while he was collecting disability benefits. Fortis only learned of his return to coaching from the FCE therapist who saw him coaching the Thunderbolts the night before.

24

and contacts with the teams' personnel departments. This evidence goes along way toward proving that plaintiff was capable of performing all the material duties[30] of his regular occupation.[31]

Second, the opinions of reviewing physicians provide ample support. Dr. Porter initially opined that plaintiff was capable of at least medium level work and that the accepted length of disability for flareups would be 3-6 weeks, and that based on the video surveillance, his chronic pancreatitis symptoms were under control. Dr. Heligman concurred and added that "[t]he available information supports the conclusion that the claimant has been capable of working in his own occupation since at least January 2000." In a second report, reviewing additional medical records, Dr. Porter concluded that plaintiff "would have 1 or 2 episodes per year requiring work loss of 1-3 weeks," after which he "would be able to return to his prior abilities." Dr. Mehta opined that plaintiff "is fully functional between acute attacks," that "working or not working would not in any way aggravate of influence the situation," and that "[t]here is no reason or time frame during which

---

[30]The Plan defines "material duties" as "the set of tasks or skills required generally by employers from those engaged in a particular occupation." Duties imposed by an individual employer that are not generally required by employers for a particular occupation do not constitute "material duties." Because plaintiff's jobs with the Chiefs, the Steeldogs and the Thunderbolts all fall within his particular and regular occupation of professional football coach, it stands to reason that the "material duties" of those positions would be the same. Plaintiff has not demonstrated otherwise. The court is not convinced that the "long hours" plaintiff claims are required by the Chiefs' job constitute a "material duty" of his regular occupation. So the fact that the Steeldogs and Thunderbolts jobs may not have required "long hours" is inconsequential. In any event, plaintiff has not proven that his pancreatitis precluded him from working "long hours." Although an October 16, 2001 letter from treating physician Dr. Champion to plaintiff's attorney lends some support to plaintiff's argument, the court notes that it was written late in the appeals process at the request of plaintiff's attorney. Also, neither Dr. Porter or Dr. Mehta (the independent reviewing physicians) opined that plaintiff had any limitations on his hours of work.

[31]See McGarrah v. Hartford Life Ins. Co., 234 F.3d 1026, 1032 (8th Cir. 2000) (primary evidence supporting decision to terminate disability benefits included surveillance videotape showing the plaintiff performing activities inconsistent with a claim of continuing disability).

25

Mr. James would not be able to work in his occupation." None of these physicians concluded that plaintiff had a restricted ability to sit, walk, or stand. Third, in response to a June 27, 2002 letter seeking an employability opinion based on plaintiff's hospitalizations and prognosis, the Chiefs stated that plaintiff could perform the material duties of his occupation.

Plaintiff seems to argue that he is disabled under the Occupation Test because of the potential for episodes of pancreatitis that would cause him to miss work and not be able to perform the material duty of working full-time (defined as 30 hours a week) during such episodes. Between episodes, though, the record reflects that plaintiff is essentially fully functional. The Plan's definition of disability is in the present tense; thus, benefits are only available for currently existing disabilities. The court agrees with Fortis that plaintiff has not shown that after his return to professional football coaching in 2000, he was presently and continuously unable to perform the material duties of a professional football coach. The mere potential for future disability does not satisfy the Plan's requirements for long-term disability benefits.[32]

Under the Earnings Test for disability, plaintiff would be considered disabled if he was actually working but could prove that his sickness prevented him from earning more than 80 percent of his pre-disability monthly pay. The test was not satisfied at the time of the final benefit determination – July 8, 2002 – because plaintiff was not working. Fortis also determined that plaintiff did not satisfy the test while he was working for the Steeldogs and the Thunderbolts. Contrary to plaintiff's assertion, it is irrelevant that his actual earnings from the Steeldogs and the

_____

[32]Logic also dictates this conclusion. For example, if plaintiff is capable of performing the material duties of his regular occupation 50 weeks out of a given year, missing 6 weeks due to pancreatitis episodes, it would render the term "long-term disability" meaningless if Fortis was required to pay him benefits for the 50 weeks that he is fully functional.

Case 4:03-cv-00031-HFS   Document 54   Filed 06/28/05   Page 26 of 28

Thunderbolts were less than 80 percent of his Chiefs monthly salary. The relevant inquiry is whether plaintiff was physically <u>precluded</u> from earning 80 percent of his former wage.[33] Based on the conclusion that plaintiff was physically able to perform all the material duties of his regular occupation, Fortis researched available positions for professional football coaches nationwide and found positions which plaintiff was qualified for and which had similar or higher salaries than plaintiff's pre-disability wages. This is substantial evidence that the Earnings Test was not satisfied.

In sum, plaintiff failed to carry his burden of proof regarding entitlement to long-term disability benefits following his return to professional football coaching in 2000. Viewing the facts in the light most favorable to plaintiff, the court finds that Fortis' decision to terminate plaintiff's long-term disability benefits was supported by substantial evidence in the record as a whole and was not an abuse of discretion. Therefore, defendants are entitled to summary judgment.

## IV.    Conclusion

For the foregoing reasons, it is hereby

ORDERED that plaintiff's motion for summary judgment (ECF doc. 44) is DENIED. It is further

ORDERED that defendants' motion for summary judgment and motion in limine (ECF doc. 42) is GRANTED IN PART, in that summary judgment will be entered in defendants' favor. Defendants' in limine request with regard to Plaintiff's Ex. B (England's declaration and the DOT

---

[33]Even if a high susceptibility to illness were treated as a disability no evidence was available to Fortis that this affected the salary offer by the Steeldogs or the Thunderbolts.

excerpt) is DENIED as moot; their in limine request with regard to Plaintiff's Ex. C (Thum's deposition) is GRANTED. The Clerk of the Court is directed to enter judgment in favor of defendants Kansas City Chiefs Football Club, Inc. Long Term Disability Insurance Plan and Fortis Benefits Insurance Company.


/s/ Howard F. Sachs
HOWARD F. SACHS
UNITED STATES DISTRICT JUDGE

June 28, 2005

Kansas City, Missouri